**Michael F. TERRY, Plaintiff, Appellant,**

v.

**BAYER CORPORATION and Bayer Corporation Disability Plan, Defendants, Appellees.**

No. 97–2190.

United States Court of Appeals, First Circuit.

Heard March 2, 1998.

Decided May 27, 1998.

James B. Krasnoo, with whom Richard Briansky and Law Offices of James F. Krasnoo, were on brief, for appellant.

William J. Klemick, with whom John J. Myers, Treazure R. Johnson, and Eckert Seamans Cherin & Mellott, LLC, were on brief, for appellees.

Before LYNCH, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

In this appeal under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.A. §§ 1001—1461 (West Supp. 1998)("ERISA"), appellant Michael F. Terry challenges the termination of his long-term disability benefits. The district court granted summary judgment to the defendants. We affirm.

## I.

As required under the summary judgment standard, we recite the following undisputed facts in the light most favorable to the non-movant Terry, drawing all reasonable inferences in his favor. *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir. 1992).

Terry began working at Bayer Corporation ("Bayer") in 1982 as a computer software test auditor.[1] At some point during the course of the next several years, Terry was moved to a new position, involving the tracking of rejected computer materials, and reporting his findings to the Bayer engineering and purchasing departments.

On or about January 5, 1987, as he exited his apartment building on the way to work, Terry slipped on ice and fell down nine steps, injuring his knee. He continued on to work that day, but on arrival was sent to the hospital by Bayer's nurse. Over the course of the next several weeks, Terry was cared for by both his primary care physician, Dr.

1. The name of the company for which Terry worked has changed over the years. For simplicity's sake, we refer to his employer solely as Bayer, the various changes in corporate identity having no bearing on Terry's claim. We do note, however, that some of the documents cited *infra* bear the name of one of Bayer's previous corporate identities—"Miles, Inc."

Walter H. Jacobs, and an orthopedic surgeon, Dr. George Ousler. Dr. Ousler determined at the time that Terry most likely had suffered a "medial lateral collateral ligament injury strain or an internal derangement of the knee." While Dr. Ousler's treatment plan was originally conservative, in March, 1987, Terry underwent arthroscopic surgery in an attempt to remedy persistent soreness and slight swelling. Pain management and physical therapy ensued for the next several months.

Terry returned to work in August 1987. He was promoted in 1988 to a position maintaining desk-top computers. In January 1990, as a result of budget cuts, Bayer transferred Terry to the position of test technician. This position involved the assembly and testing of computer boards, and involved considerably more physical activity than his previous positions; Terry was now required to move containers of computer boards around the workplace. After having been in his new position for approximately one month, Terry's knee buckled and he fell to the ground. This incident occurred outside of the workplace.

As a result of this second injury, Terry did not return to work at Bayer. A second arthroscopic surgery was soon performed, and torn cartilage and bone chips were removed from his knee.

Terry's primary care physician, Dr. Jacobs, states that Terry suffers from a degenerative knee condition which results in bone-on-bone contact. As a result of the condition, Terry is in almost constant pain, and is unable to stand, sit, or otherwise maintain a single stationary position for any extended period of time. Dr. Jacobs treats Terry's pain with a variety of anti-inflammatories and painkillers.

In July, 1990, Bayer approved Terry's application for long-term disability benefits. The Summary Plan Description ("SPD") states that long-term disability benefits are provided under the Bayer Long–Term Disability Plan ("Plan") when a beneficiary is "unable to work at any job for which [they] are qualified by education, training, or experience."

As Plan Administrator, Bayer retained Northwestern National Life Insurance Company ("Northwestern") to process and manage claims made under the Plan.[2] As part of that service, Northwestern assigned Anne Tacl to Terry's case to serve as rehabilitation case manager. Tacl's job was to monitor Terry's medical condition in order to make sure that he continued to meet the Plan's definition of total disability. Tacl was also charged with attempting to rehabilitate Terry, with the goal of returning Terry to full-time employment. These responsibilities were consistent with Plan provisions. Because Tacl was based in Minnesota, Tacl hired Sandy Lowery to provide local rehabilitation services to Terry.

In April, 1991, Tacl received a report from a Dr. Zarins, an orthopedic surgeon whom Terry had consulted prior to the active involvement of Northwestern. That report opined that Terry's accounts of pain did not correspond to the pathology observed in his knee. Dr. Zarins stated that Terry could return to part-time work with certain significant restrictions. Northwestern, however, was unable to locate an appropriate job for Terry at Bayer. Dr. Zarins saw Terry again one year later, in April 1992, and again determined that Terry could perform sedentary work on a part-time basis. Dr. Jacobs, for his part, however, continued to insist that Terry was completely disabled.

In November of 1992, Tacl, as authorized by the Plan, scheduled an independent medical evaluation ("IME") in an attempt to resolve the conflicts in medical opinion. The IME was performed by Dr. Thomas King, who determined that Terry's pain was "out of proportion to all physical findings," but wanted to rule out "reflex sympathetic dystrophy" ("RSD").[3] Terry was referred to another

---

2. During the pendency of this litigation, Northwestern changed its name to "Reliastar Insurance Company." For simplicity's sake we refer here to this company solely as "Northwestern."

3. Reflex sympathetic dystrophy is a neurologic disorder of "sympathetically mediated pain occur[ring] following injury to bone and soft tissue." The Merck Manual of Diagnosis and Therapy 1418 (16th ed.1992).

specialist, who determined that Terry was not suffering from RSD.

On the basis of these medical evaluations, Tacl decided that Terry should participate in a work-hardening rehabilitation program, with the goal of returning Terry to full-time employment. Terry was informed, pursuant to a Plan provision, that if he failed to attend a rehabilitation program, his benefits would be terminated. Terry was given a choice among three institutions, and he opted to attend Farnum Industrial Rehabilitation ("Farnum"). Dr. Jacobs eventually signed off on the referral to Farnum, but did not think the program would be helpful to Terry.

Dr. Robert Haile, the Medical Director at Farnum, examined Terry upon his entry to the program. Haile opined at the time that,

[Terry's] degree of disability ... appears to be out of proportion to the degree of findings in his knee. I believe the patient has developed chronic pain syndrome, which refers primarily to the whole person effect of a chronic painful injury. It involves in addition to local persistent pain the psychosocial effects of chronic pain. I think the patient would be a good candidate for Work Hardening.

Dr. Haile did not doubt that Terry's pain was genuine. Although Terry's Farnum experience started out well enough, in the end Terry had completed fourteen rehabilitation sessions and canceled thirteen. Terry states that the cancellations were due primarily to complaints of severe pain, caused by the effort required to attend and participate in the rehabilitation program.

At about the same time as he was participating in the Farnum program, Terry was referred by Tacl to Deborah Veatch, a local vocational rehabilitation consultant. Although Terry was initially receptive to Veatch's services, his interest and participation in her services quickly waned. Veatch eventually communicated to Tacl that "[b]ased on Mr. Terry's obvious lack of follow through with treatment *and* vocational activities, ... Mr. Terry is most likely *not* an appropriate candidate for vocational rehabilitation services." Veatch did conclude, however, that Terry possessed transferable skills in the computer field.

On January 20, 1994, Terry was discharged from the Farnum program. The Program Director, Cheryl Baldwin, reported in the discharge summary: "Mr. Terry is capable of working full time, although the amount of standing needs to be limited. He is able to sit for two to four hours with intermittent stretch breaks. Mr. Terry is currently at Sedentary–Light duty work capacity. He has full, unlimited use of his upper body." Tacl thereafter requested that Dr. Haile complete a Physical Capacities Evaluation. Dr. Haile did so, and released Terry to full-time work with restrictions on continuous time in a sitting or standing position, as well as lifting, bending, and crawling.

Terry received a letter dated February 24, 1994 from Tacl indicating that she was recommending that his benefits be terminated. The letter stated that "[b]ecause you have been released to work with restrictions, you no longer meet the [Plan's] definition of total disability." Shortly thereafter, Terry received a termination letter dated March 3, 1994. The letter stated that, "[d]isability is defined as your complete inability to work in any job for which you[ ] are reasonably fitted by education, training, or experience. Based on a review of the medical and vocational information in your file you are no longer totally disabled from performing 'any occupation.'" Terry was advised of certain of his appeal rights, and benefits were terminated retroactively to February 25, 1994. Terry's benefit checks were not continued during the pendency of his appeals.

Shortly after Terry's termination, Tacl received a letter from Dr. Haile. Dr. Haile apparently sent the letter after receiving a phone call from Dr. Jacobs. The Haile letter stated that Haile had only been a consultant in a work-hardening program, and if Tacl required a formal "work release," that release would have to come from Dr. Jacobs.

Terry requested an appeal from Northwestern's decision. The "Northwestern ERISA Committee" was convened, reviewed his entire file, and upheld the benefits termination. Terry was advised of this by letter dated March 25, 1994. That letter stated that "[a]lthough Dr. Jacobs provided us with

a detailed historical account of your problems with knee pain, he did not provide us with objective evidence to support your total disability from *all* occupations, as your LTD plan requires." Terry was informed in the letter that further requests for appeal should be directed to Bayer.

On June 1, 1994, Terry—now represented by counsel—sent a letter to Tacl demanding reinstatement of benefits. Tacl informed Terry that Bayer would handle any further appeal, and notified Bayer of the receipt of the latest request from Terry. By letter dated July 18, 1994, Bayer's Benefits Manager Joyce Fleischer notified Terry of the steps he needed to take in order to perfect an appeal before the Bayer Benefit Administration Committee ("Benefit Committee"). Included in that letter was the requirement that Terry file his appeal within sixty days. A copy of the relevant appeal procedure from the SPD was appended to Fleischer's letter.

It was not until August 15, 1995—over one year later—that Terry formally requested an appeal before the Benefit Committee. Additional materials were forwarded to Bayer,[4] and Bayer scheduled a meeting of the Committee to decide the appeal. Before the meeting, Bayer requested that Northwestern's ERISA Committee also review the additional materials forwarded by Terry. The Northwestern Committee did so, and again affirmed its decision to terminate benefits. The Bayer Benefit Committee met on December 6, 1995, reviewed Terry's file, and voted to uphold the termination of benefits.

Terry was advised of the decision by a letter from Bayer's employee benefits counsel dated December 21, 1995, stating the Benefit Committee's reasons for upholding the termination. First, the Benefit Committee determined that Terry's appeal was untimely, because it was not filed within the sixty-day time period provided for in the Plan and communicated to Terry in the letter from Fleischer. The Committee went on "[a]s a courtesy to [Terry]", to reach the merits of Terry's appeal. The Benefit Committee detailed the following.

To assist the Bayer Corporation in making its determination, our agent, [Northwestern], has been extensively involved in evaluating Mr. Terry's medical condition as well as his ability to return to work. With the approval of Dr. Jacobs, Mr. Terry was put in a "work hardening" program—which is an approved rehabilitation program under the terms of the Plan. During the nine week period of the program, he attended fourteen sessions, canceled thirteen sessions and did not complete the program. On February 1, 1994, at the end of the program, he was released to full-time, sedentary work by Dr. Haile. Dr. Haile was the Medical Director and Physiatrist specializing in assessment of functional capacities in the work hardening program. Based on Dr. Haile's release, as well as Mr. Terry's failure to participate to any meaningful extent in the work hardening program, the Committee would uphold the termination of Mr. Terry's benefits under the Plan even if his appeal was timely filed.

It is also important to note that the Committee considered the information you supplied from Dr. Jacobs, Dr. Taylor, the Social Security Administration and Paul Blatchford but, as it is permitted to do under the terms of the Plan, concluded that the opinions of Dr. Haile and Debbie Veatch, a vocational expert, were more credible because those opinions are based on the objective medical testing performed during the work hardening program and Mr. Terry's medical status as of February 1, 1994.

Dr. Jacobs is not a specialist but rather a generalist who has consistently prescribed narcotic medications to treat the pain associated with Mr. Terry's condition but has not been directly involved in any rehabilitative course of action for Mr. Terry's condition. Although Dr. Taylor is a specialist, his report does not include any

---

4. These materials consisted of (i) an additional report from Dr. Jacobs; (ii) a report from an orthopedist, Dr. Howard Taylor; (iii) a letter from the Social Security Administration ("SSA") granting Terry disability benefits; and (iv) a report from Paul Blatchford, a vocational expert. All these materials, save for the SSA letter, opined that Terry was completely disabled from performing "any job."

information regarding objective testing performed on Mr. Terry in determining his physical capabilities. Also, the information provided by Dr. Taylor is based on his medical condition as of July 10, 1995—approximately seventeen months after his February 1, 1994 release. Similarly, Mr. Blatchford's report is based on Mr. Terry's medical condition as of October 20, 1995—approximately 20 months after his February 1, 1994 release—and is based on subjective medical complaints rather than objective testing.

Terry filed suit under ERISA in Superior Court, Essex County, Massachusetts, in February, 1996, alleging that the benefits termination contravenes the Plan language. The Bayer Plan removed to federal court, *see Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), and in due course moved for summary judgment. The district court, by margin order, granted summary judgment in defendants' favor on all claims, finding no abuse of discretion in the benefits termination.[5] This appeal followed.

■ Our standard of review over the district court's decision on summary judgment is de novo. *See Vartanian v. Monsanto Co.*, 131 F.3d 264, 266 (1st Cir.1997). We are directed to grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated that summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, Terry bears the burden of making "a showing sufficient to establish" a violation of ERISA, namely, that the benefit termination was unreasonable.

II.

ERISA is a "comprehensive and reticulated statute," *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), which governs the rights and responsibilities of parties in relation to employee pension and welfare plans, *see generally New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650–51, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). This federal statute includes a cause of action for plan participants, and other beneficiaries, "to recover benefits due to him [or her] under the terms of his [or her] plan." 29 U.S.C.A. § 1132(a)(1)(B). It is under this statutory provision that claims, such as this one, challenging denials and termination of employer-sponsored disability benefits are brought.

Although Terry presents his arguments on appeal in a variety of arrangements, his positions can be effectively stated as follows. First, Terry posits that this court should review the decision of Northwestern, as opposed to that of the Bayer Benefit Committee, in making the determination whether the disability benefits were wrongfully terminated. Next, Terry argues that, regardless of which decision we review, that review should not be conducted pursuant to the abuse of discretion standard adopted by the district court, but instead should be conducted de novo; in other words, Terry asks us to undertake an independent review of the record and decide whether Terry is "disabled" within the meaning of the Bayer Plan. Finally, Terry urges us to determine that, regardless of the standard applied, and regardless of the decision we review, the benefits termination violated ERISA because (1) Terry received defective notice of termination, and (2) he was, and is, totally disabled within the meaning of the Plan. We address each position in turn.

---

5. The district court also granted summary judgment to Bayer Corp. on the basis that the Plan was the only proper party to the action. Terry appeals this decision as well. Because we agree with the district court that the benefits termination was not an abuse of discretion, and thus no violation of ERISA transpired, we need not reach the issue of the proper defendant in this case.

### A.

As we have stated, Bayer contracted with a third party, Northwestern, to provide administrative assistance to the Benefit Committee. The agreement between Bayer and Northwestern, entitled "Administrative Services Only Agreement" ("ASO Agreement"), stipulated that Northwestern was to, among other things, "[i]nvestigate and process claims ... [, e]valuate claims for potential rehabilitation ... [, and u]pon receipt of the Plan Sponsor's final decision on claims appeals, make payment or issue a denial notice in accordance with the Plan Sponsor's decision." ASO Agreement § 1(B)(1). The ASO Agreement specifically disclaimed any responsibility on Northwestern's part as a Plan Administrator. *Id.* § 5(A). The existence of this contractual arrangement between Northwestern and the Benefit Committee was authorized by the Benefit Committee's governing guidelines. Miles, Inc. (Bayer) Administrative Procedures for the Benefit Administration Committee Art. VII, § 2 ("Admin.Proc.").

■ Terry's argument that we should review the decision of Northwestern, and ignore the later decision by the Benefit Committee, is stated in his brief as follows: "The Plan vests discretionary authority with Bayer Corporation, the Plan's fiduciary. Northwestern, however, not Bayer Corp., made the initial decision to terminate Mr. Terry's benefits. Bayer delegated only its *administrative duties* to Northwestern, but expressly reserved and thereby intentionally withheld any *fiduciary authority* from Northwestern." Appellant Br. at 22. Terry argues that, because the Plan itself did not grant Northwestern any discretionary authority to interpret the meaning of the plan, Northwestern's "initial decision" must be considered afresh under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

In *Firestone,* the Supreme Court ended the debate over the proper standard of review that courts should employ when examining the out-of-court decisions of plan administrators to deny benefits. The Court stated that, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* Thus, Terry argues that because the Plan does not grant the decision-maker the necessary authority to resolve disputes, determinations made by that decision-maker are reviewed de novo.

In making his argument, however, Terry ignores the fact that the decision of Northwestern was but one step in the process. It was not the final and binding termination decision. In Terry's own words, it was the "initial decision." We must focus, as in the usual case, on the determinations of the final decision-maker, which was the Bayer Benefit Committee.

■ "ERISA contemplates actions against an employee benefit plan and the plan's fiduciaries. With narrow exception, however, ERISA does not authorize actions against nonfiduciaries of an ERISA plan." *Santana v. Deluxe Corp.,* 920 F.Supp. 249, 253 (D.Mass.1996). *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262–63, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Reich v. Rowe,* 20 F.3d 25, 29 (1st Cir.1994) (nonfiduciary liability limited to those "who commit violations of ERISA or who are engaged in an 'act or practice' proscribed by the statute"). Courts have determined that when the plan administrator retains discretion to decide disputes, a third party service provider, such as Northwestern, is not a fiduciary of the plan, and thus not amenable to a suit under § 1132(a)(1)(B). *See, e.g., HealthSouth Rehab. Hosp. v. American Nat'l Red Cross,* 101 F.3d 1005, 1008–09 (4th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 2432, 138 L.Ed.2d 194 (1997); *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.,* 57 F.3d 608, 613–14 (7th Cir.1995); *Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.,* 990 F.2d 513, 516 (9th Cir.1993); *Baker v. Big Star Div. of The Grand Union Co.,* 893 F.2d 288, 289–90 (11th Cir.1989). An interpretive bulletin issued by the Department of Labor bears this out, stating that an entity which merely processes claims "is not a fiduciary because such person does not have discretionary authority or discretionary control re-

specting management of the plan." 29 C.F.R. § 2509.75–8, D–2 (1997). Thus, "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997).

Similarly, as we recognized in *Rowe*, 20 F.3d at 32, ERISA itself significantly limits the liability of service providers in actions under the statute. The *Rowe* panel refused to exercise its power to fashion a common law remedy to generally extend "the threat of liability over the heads of those who only lend professional services to a plan without exercising any control over, or transacting with, plan assets." *Id.* Such liability was withheld in *Rowe* in recognition of, *inter alia*, the fact that it would likely "deter such [service providers] from helping fiduciaries navigate the intricate financial and legal thicket of ERISA." *Id.; see also Buckley Dement Inc. v. Travelers Plan Admins. of Ill., Inc.*, 39 F.3d 784, 790 (7th Cir.1994)(approving of *Rowe* reasoning).

Terry is correct when he points out that this line of cases is concerned with service provider liability, and as such does not necessarily foreclose the construct he suggests—to review the decision of Northwestern but hold the Plan liable. Nevertheless, we find the precedent compelling. We do not think it supportable or reasonable for a court, when conducting this form of inquiry, to examine an intermediate step in the internal review process de novo. After all, we have determined that a prerequisite to obtaining judicial review under § 1132(a)(1)(B) is that the claimant have exhausted the internal administrative remedies available to him. *Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 825–26 (1st Cir.1988). Thus, if Terry had approached the district court after having received the termination letter from Northwestern, but prior to his appeal to Bayer, his case would likely have been dismissed for failure to exhaust the internal ERISA remedies. *See, e.g., Tarr v. State Mut. Life Assur. Co. of Am.*, 913 F.Supp. 40, 43–45 (D.Mass.1996)(relying on *Drinkwater* ). It seems an odd proposition to now ignore the results of those mandated internal adminis-

trative remedies, and focus de novo review on the intermediate step taken by Northwestern. We reject Terry's argument that we review Northwestern's decision de novo.

Terry argues that the fact that his benefits were terminated by Northwestern (subject to appeal to Bayer) means that Northwestern, not Bayer, was the real decision-maker. The balance of the record, however, convinces us otherwise. The record amply demonstrates that Bayer and the Committee retained—by written instrument—the discretion to decide disputed claims. There is nothing to suggest that Northwestern was doing anything other than applying the terms of the Plan as written to Terry's particular situation. Although it may have been imprudent for Northwestern to terminate Terry's benefit checks as soon as it made the initial decision, Terry has not demonstrated that he would not have been entitled to a back payment of his disability benefits if his appeal at Bayer were successful. Indeed, the ASO Agreement specifically requires Northwestern to adhere to the determinations of the Benefit Committee. Therefore, although we recognize the impression generated by Northwestern's immediate termination, the remainder of the record simply does not support the position Terry presses. Bayer's Benefit Committee was the entity with the power to make, and is the entity that actually made, the final decision to terminate Terry's benefits. It is therefore the decision of the Benefit Committee which we shall review.

### B.

We next turn to the proper standard of review to apply in examining the out-of-court decision of the Benefit Committee. Two issues need to be addressed in formulating the proper standard of review. First we determine whether the Plan expressly grants discretionary authority to the plan administrator to determine a claimant's eligibility. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. Second, we decide whether the administrator has properly delegated that discretionary authority to the Benefit Committee. *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir.1993). We address each point in turn.

As we have previously outlined in part A, *supra*, the Supreme Court has determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *see also Varity Corp. v. Howe*, 516 U.S. 489, 513, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)("At present, courts review [plan coverage] decisions with a degree of deference to the administrator, provided that the benefit plan gives the administrator or fiduciary discretionary authority ....") (internal quotation marks omitted).

■ We have steadfastly applied *Firestone* to mandate de novo review of benefits determinations unless "a benefits plan ... clearly grant[s] discretionary authority to the administrator." *Rodriguez–Abreu*, 986 F.2d at 583; *see also Diaz v. Seafarers Int'l Union*, 13 F.3d 454, 456 (1st Cir.1994); *Allen v. Adage Inc.*, 967 F.2d 695, 697 (1st Cir.1992); *Bellino v. Schlumberger Techs., Inc.*, 944 F.2d 26, 29 (1st Cir.1991). Where the clear discretionary grant is found, "*Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review." *Recupero v. New England Tel. and Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997) (internal quotation marks omitted).[6]

■ The record in this case demonstrates that the Plan grants discretionary authority to the Plan Administrator to make the necessary judgment calls concerning claimant eligibility. First the Plan names "The Company"—Bayer—as Plan Administrator, before going on to state that,

> The Company shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plans including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plans. The Company shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision.

Miles Inc. Disability Plans § 8.4 ("Plan"). *Rodriguez–Abreu* counsels that the grant of discretionary authority must be clear. 986 F.2d at 583. We think the language quoted above admits of no other interpretation. In *Cooke v. Lynn Sand & Stone Co.*, we determined that the plan language was insufficient to satisfy *Firestone*. 70 F.3d 201, 204 (1st Cir.1995). There, the plan language stated only that the administrator had "exclusive control and authority over administration of the Plan." [7] In contrast, Bayer's Plan specifically allocates to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan.

■ The next step in the process is to determine whether there has been an effective delegation of that discretionary authority from the Plan Administrator to the Benefit Committee. "ERISA allows named fiduciaries to delegate responsibilities," *Rodriguez–Abreu*, 986 F.2d at 584, by "expressly provid[ing] for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan," 29 U.S.C.A. § 1105(c)(1)(B). Here, the Bayer Plan states that "The Company may appoint one or more

**6.** Although *Firestone* arguably does not specify the precise standard of review to be used when the discretionary grant is found, most courts pre-*Firestone* reviewed plan coverage decisions under the arbitrary and capricious standard. *Firestone*, 489 U.S. at 109, 109 S.Ct. 948. *Firestone* itself described the proper standard in terms of "arbitrary and capricious," *id.* at 109–111, 109 S.Ct. 948, and "abuse of discretion," *id.* at 113–115, 109 S.Ct. 948. We agree with then-Judge Ruth Bader Ginsburg that "there is no need to adopt one phrase and avoid the other. The reasonableness of the Plan Committee's decision is our polestar...." *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1454 (D.C.Cir.1992).

**7.** Our decision in *Cooke* does not quote the relevant plan language. We have drawn the quote from the district court opinion in that case. *Cooke v. Lynn Sand & Stone Co.*, 875 F.Supp. 880, 883–84 (D.Mass.1994).

individuals to act on its behalf, in which case every reference herein made to the Company shall be deemed to mean or include the individuals as to matters within their jurisdiction." Plan § 8.3. Bayer took the Plan up on its offer, and formed the "Benefit Administration Committee" which was designed to "act on behalf of the Corporation by assisting the Corporation in fulfilling its administrative duties which are set forth in the employee benefit plans." Admin. Proc. Art. I, § 1. Part of the Committee's duties included responsibility for the initial review of claims (or delegation thereof), and the impartial review of claim denials. Admin. Proc. Art. VII, § 2.

We think this constitutes an effective delegation of discretionary authority from the Company to the Benefit Committee. Our conclusion is supported by the fact that vested within the Committee, and pursuant to the Plan, was the responsibility to deny a claim "only if there [was] a reasonable basis for the denial," as well as the responsibility to "conduct a complete and adequate review before making a decision upholding the denial of a claimant's benefit." *Id.* The Committee had been given the authority to make "reasonable" decisions, an inherently discretionary function. In *Rodriguez–Abreu,* 986 F.2d at 584, we stated that reliance on "inferences from the circumstances ... [was] insufficient to prove delegation of discretionary authority." No inferences need be drawn where we discern a clear and direct delegation—by written instrument—from the Plan Administrator to the Benefit Committee.

What emerges from the record is that: (i) the Plan granted Bayer the discretionary authority to interpret and apply the terms of the Plan; (ii) the Plan authorized Bayer to delegate duties and authority; and (iii) Bayer delegated the discretionary authority to review claims and appeals to the Committee. The decisions of the Committee are, therefore, entitled to deferential review.

 We reject Terry's argument that the "Limitations" clause of the Administrative Procedures document alters this equation. The clause states that "The Committee and its Members ... shall not have any independent fiduciary duties under the employee benefit plans." Admin. Proc. Art. VII, § 1. Terry argues that this means that the Committee had *no* fiduciary responsibilities whatsoever, and therefore no discretionary authority attached to its decisions. This argument, of course, ignores the import of the word "independent." That the Committee is deemed not to have any *"independent fiduciary duties"* does not mean that they have none. Rather, we think the most plausible reading of the Limitations clause is that the Committee's fiduciary responsibilities do not extend beyond those required to carry out the duties assigned to it. This conclusion is supported by the very nature of ERISA fiduciary responsibility. "[F]iduciary status is not an all or nothing proposition; the statutory language indicates that a person is a plan fiduciary only 'to the extent' that he possesses or exercises the requisite discretion and control." *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 18 (1st Cir.1998) (quoting 29 U.S.C. § 1002(21)(A)). As a result, the clause has no effect, for our purposes, on Bayer's delegation to the Committee, and by extension, no effect on the standard of review to be employed.

### C.

Turning to the merits of the case, Terry first argues that the notice of termination did not comply with ERISA. The statute specifies that a plan "shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C.A. § 1133(1). The interpretative regulations go on to require that the notice contain,

(1) The specific reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or

beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f). Terry argues that because neither Northwestern nor Bayer ever informed him of the specific documentation or medical reports needed to obtain a favorable decision, both entities failed to comply with ERISA's notice requirements.

■ To be sure, the letters Terry received merely directed him to forward "any information which may affect the decision to terminate your claim." Terry therefore argues that, under 29 C.F.R. § 2560.503–1(f)(3), *supra*, he was entitled to a more detailed description of materials necessary for a successful appeal. We are not convinced, however, that the regulatory standard quoted above necessarily requires an administrator (or agent thereof) to inform Terry of "what additional information Mr. Terry should include *in order to win* his appeal." Appellant Br. at 41 (emphasis added). Instead, the regulations mandate that the administrator describe what is required to "perfect the claim." Terry has not convinced us that "perfect the claim" is synonymous with "win the appeal."[8] Indeed, it would seem to us that in the instant case, neither Northwestern nor Bayer contended that Terry's claim was deficient. The decision was simply that the lack of objective findings, together with the failure to participate more fully in the work hardening program, did not support a finding of total disability. Regardless, however, of whether Bayer and Northwestern failed to comply formally with the regulations, and we do not imply any such failure, precedent in this circuit and others is to the effect that ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures.

This court has recently concluded "that allowing a claim for relief because of inadequacy of formal notice without any showing that a precisely correct form of notice would have made a difference would result in bene-

fit claims outcomes inconsistent with ERISA aims of providing secure funding of employee benefit plans." *Recupero*, 118 F.3d at 840. Similarly, the Seventh Circuit has stated:

> Not all procedural defects ... will upset a fiduciary's decision. Substantial compliance with the regulations is sufficient. In determining whether there has been substantial compliance, the purpose of 29 U.S.C. § 1133 and its implementing regulations, 29 C.F.R. § 2560.503–1(f), serves as our guide: "was the beneficiary supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review."

*Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994) (citations omitted)(quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir.1992)).

■ The record reveals that Terry was, in fact, "permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Id.* He submitted additional medical and vocational information to the Benefit Committee which directly addressed the question whether he was disabled from performing "any" job. His actions demonstrate that he was well aware of the reasons for the decision, and was submitting additional evidence on the crucial point. Moreover, he was on notice that a critical issue was the lack of objective medical testing in support of his claim, having been informed of that deficiency in the letter from Northwestern's ERISA Committee. Finally, he has failed to demonstrate the prejudice that *Recupero* requires. Terry has not presented any evidence that implies that a different outcome would have resulted had the notice been in formal compliance with the regulations. As a result, Terry has not shown that the alleged defect abridged his right to "a full and fair review by the appropriate ... fiduciary." 29 U.S.C.A. § 1133(2).[9]

---

**8.** "Perfect," when used in this context, usually means "to bring to ... completion." Webster's II New Riverside University Dictionary 873 (1994). Thus, a complete claim is not necessari-

ly the same as a successful claim because even a complete claim can be denied.

**9.** Terry also posits that each of the individual letters he received throughout the termination

■ We now turn to the heart of this appeal, and determine whether the decision of the Benefit Committee was arbitrary and capricious. It is, of course, the hallmark of such review that "a court is not to substitute its judgment for that of the [decision-maker]." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Rather, in the ERISA context, it has been stated that under the arbitrary and capricious standard, "a fiduciary's interpretation of a plan will not be disturbed if reasonable." *DeWitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir.1997).

The Benefit Committee gave two reasons for its decision to uphold the termination of benefits. The first was that Terry had failed to perfect his appeal within the proper sixty-day time limit. The second was that Terry no longer met the Plan's definition of disability. Terry fails to present evidence to demonstrate that either decision was unreasonable.

■ It was not improper for the Benefit Committee to have held Terry to the sixty-day appeal period.[10] *Drinkwater* mandates that a claimant must have exhausted the plan's administrative remedies before bringing suit to recover benefits. 846 F.2d at 825–26. This court is not alone in so holding. *See, e.g., Communications Workers of Am. v. AT & T*, 40 F.3d 426, 431–34 (D.C.Cir.1994); *Makar v. Health Care Corp.*, 872 F.2d 80, 82–83 (4th Cir.1989); *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir.1980). A claimant is required to attend to the plan's internal appeal process first, unless "the administrative route is futile or the remedy inadequate." *Drinkwater*, 846 F.2d at 826 (quoting *Amato, supra*). Terry has not attempted to make any showing of futility or inadequacy.

■ We have not yet had the opportunity to apply the *Drinkwater* exhaustion requirement to the situation here where a claimant files an appeal, but does so late. In such a circumstance the claimant, while ostensibly availing himself of the internal review process, has procedurally defaulted as a result of the late filing. The same principles which inform the ERISA exhaustion requirement also counsel that part of that internal administrative process includes the responsibility on the claimant's part to file appeals in a timely fashion. *Cf. Counts v. American Gen. Life and Acc. Ins. Co.*, 111 F.3d 105, 108 (11th Cir.1997) (observing that attorney's letters contesting aspects of benefit denial sent four and ten months after sixty-day appeal period expired constitutes failure to exhaust administrative remedies). As the Fourth Circuit reasoned in *Makar*,

> Congress' apparent intent in mandating these internal claims procedures was to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement. It would be anomalous if the same reasons which led Congress to require plans to provide remedies for ERISA claimants did not lead courts to see that those remedies are regularly utilized.

872 F.2d at 83 (quotation marks and citations omitted). It would hardly make sense to permit the filing of an appeal over one year late in light of the internal claims procedures' aims of consistency and economy. Haphazard waiver of time limits would increase the probability of inconsistent results where one claimant is held to the limitation, and another is not. Similarly, permitting appeals well after the time for them has passed can only increase the cost and time of the settlement process.

This would be, of course, a different case if Terry's procedural default was caused by

---

process constituted insufficient notice. Again, he fails to demonstrate how he was prejudiced by these apparent deficiencies. As we have explained, we think Terry's own actions demonstrate that he was afforded the opportunity for a full and fair review.

10. Terry argues that the Plan has waived this argument by proceeding to address, in its letter to Terry, the merits of his appeal. The language of the Benefit Committee's letter clearly disproves this assertion. It expressly rejects the appeal on the basis of timeliness, and only discusses the merits of the appeal as a "courtesy" to Terry.

improprieties on the part of the Plan. Instead, Terry's lapse was egregious because Bayer's Benefits Manager, Ms. Fleischer, took affirmative steps to inform Terry of exactly how to pursue an appeal. A letter was sent to Terry which informed him of the sixty-day time period, appended to which was a copy of the relevant appeal provisions from the SPD. Yet Terry did not bother to request an appeal until over one year later, despite the fact that he was represented by counsel at the time the Fleischer letter was received. We therefore do not think it unreasonable for the Benefit Committee to have denied Terry's appeal on the basis that it was not filed on time.

Nor do we think the Benefit Committee would have been unreasonable if its sole basis for rejecting the appeal was that Terry was no longer unable to perform "any job for which [Terry was] qualified by education, training, or experience." There was evidence before the Committee that: (i) several doctors (including Dr. Jacobs) had at various times determined that Terry could perform either part-time or full-time sedentary work; (ii) Terry was trained to be a computer technician; (iii) Terry possessed transferable skills in the computer field; and (iv) based on observations at Farnum (the rehabilitation center), Terry was capable of working full time, so long as his job did not entail certain physical tasks, and he was permitted accommodations to alleviate his knee pain. We also note that Terry failed to participate fully in the work hardening program. On such a record, we think it to be a reasonable interpretation to say that Terry was no longer precluded from performing "any job," as the Plan requires. After all, Terry was trained and experienced in computer technology and software, which can be readily adapted to a sedentary worker's needs. That there were contradictory opinions before the Committee does not render the Committee's decision arbitrary or capricious. The Benefit Committee was charged with the duty of resolving disputes concerning claimant eligibility, and their determination in this regard is supported by substantial evidence. *See Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir.1995)(not-

ing that decision unsupported by substantial evidence would be arbitrary and capricious).

Finally, Terry asserts that he was "set up" by Northwestern in that Northwestern forced him into a rehabilitation program that was designed to result in a release to work—regardless of his capacity to do so. Thus, the argument goes, the record relied upon by the Benefit Committee (and generated by this "set up") was unreasonably biased against him, and as such failed to afford him an impartial appeal. We fail to see the evidentiary basis for the argument. Our review of the record reveals only good-faith efforts to determine whether Terry continued to meet the Plan's definition of disability. The record discloses that Tacl decided upon the rehabilitation course only after being confronted with conflicting medical opinions concerning the extent of Terry's disability. Both the IME and the rehabilitation program were specifically authorized by Plan documents. *See* SPD at 11. There is nothing in the record to suggest that the Farnum program was a sham. We therefore do not think Terry has adduced sufficient evidence on this argument to survive summary judgment.

On the record before us, we cannot say that the decision of the Benefit Committee to uphold the termination of Terry's long-term disability benefits constitutes an arbitrary or capricious decision. As a result, summary judgment was properly entered against Terry.

For the reasons stated, the decision of the district court is affirmed. Costs awarded to appellee.