**Antoinette PISCOTTANO**

v.

**METROPOLITAN LIFE INSURANCE CO.**

No. 3:99CV500 (JBA).

United States District Court, D. Connecticut.

Sept. 22, 2000.

Robert L. Schwab, Kennedy, Johnson, D'Elia & Gillooly, New Haven, CT, for Antoinette Piscottano, plaintiff.

Theodore J. Tucci, Erin K. O'Brien, Robinson & Cole, for Metropolitan Life Ins. Co., defendant.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT [DOC. # 27, 31]

ARTERTON, District Judge.

### I. Overview

This case arises out of defendant Metropolitan Life Insurance Company ("Met-Life")'s decision to terminate Antoinette Piscottano's long term disability benefits after she ran for Mayor of the City of New Haven. MetLife provided a Long Term Disability ("LTD") Benefits Plan to Southern New England Telephone Company ("SNET"). The Plan is an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). *See* Compl. ¶ 1.

Ms. Piscottano was employed by SNET as a customer service representative from March 1981 until June 1988, when she became totally disabled within the meaning of the LTD plan. Her LTD claim was approved on March 9, 1989. *See* Compl. ¶ 4. Ms. Piscottano received LTD benefits from March 9, 1989 until December 31, 1997, when MetLife determined that she was no longer eligible. *See id.* ¶ 6. Ms. Piscottano appealed MetLife's termination decision and, on March 30, 1998, MetLife concluded the review process and upheld the termination of her benefits. *See*

3/30/98 MetLife Letter, Defendant.'s Ex. 47.

Plaintiff now moves for summary judgment on Count One of the Complaint on the grounds that "based on the record, MetLife's decision to deny the plaintiff's long term disability benefits was arbitrary and capricious, and thus the plaintiff is entitled to judgment on her claim of violation of ERISA as a matter of law." Plaintiff.'s Mot. for Summ.J. [Doc. # 31] at 2–3. MetLife argues that its decision to terminate Plaintiff's benefits was reasonable given the "ample evidence upon which to conclude that the Plaintiff is not disabled under the terms of the Plan," and has cross-moved for summary judgment on the claim of improper termination. Defendant.'s Mem. in Supp. of Mot. for Summ.J. [Doc. # 28] at 2.

## II. Background

### A. The Disability Plan

A participant in the LTD Plan is considered "disabled" if, due to a non-SNET-job-related illness or injury, the participant is "unable to perform the duties of any job for which he or she is qualified or may reasonably become qualified based on training, education, or experience." Defendant.'s Ex. 1, LTD Plan, LTD–11. The plan also provides benefits for an individual who is only capable of working in a job for which she might reasonably become qualified, as long as the only jobs for which she could become qualified would pay less than half of the income she had previously earned at SNET. See id. This provision does not apply if the claimant is determined to be capable of working in a job for which she is already qualified. See id.

The plan provides that LTD benefits may be terminated for a variety of reasons, including the recipient's failure to supply adequate medical information to the insurance company to substantiate the disability claim, failure to see another physician if requested by the insurance company, and performing activities which are inconsistent with her diagnosis or disability, without prior approval from the insurance company. See id. at LTD–7.

### B. The Administrative Record

As noted above, Ms. Piscottano began receiving LTD benefits in March 1989. She has been diagnosed with spondylolysis, and has undergone multiple spinal surgeries to treat her back pain. She has had a posterior spinal fusion, a cervical fusion, and a lumbar laminectomy, and anterior interbody spine fusion over multiple levels, as well as surgeries for the insertion and removal of instruments that required bone grafting. As a result of these severe back problems, Plaintiff has been diagnosed with a chronic pain syndrome. See Pl. Reply in Supp. of Mot. for Summ.J. [Doc. # 38], at 10.

In the summer of 1995, the *New Haven Register* published an article that described Ms. Piscottano's campaign for Mayor of New Haven, Connecticut. See Def.'s Ex. 7. In response to the article, The Travelers, the former plan administrator, wrote to Dr. Lieponis, Plaintiff's treating physician on July 31, 1995, asking how Plaintiff could campaign for mayor and perform mayoral duties if she is incapable of employment. See Def.'s Ex. 9. Dr. Lieponis replied that the medical information he had provided to Travelers in support of Plaintiff's disability is "both accurate and reliable" and that he did not feel any responsibility "to review any material published in the lay press."[1] 8/16/95 Lieponis Letter, Def.'s Ex. 10.[2]

---

1. The medical information to which Dr. Lieponis referred was the Attending Physician's Statement from July 1995, which indicated that Piscottano would never recover sufficiently to perform her former duties as a SNET customer service representative, and that her capacity for other part-time or full-time work was "undetermined." Def.'s Ex. 11.

2. A Travelers record notes that in a September 6, 1995 conversation with Ms. Piscottano,

Concerned that Piscottano's reported campaign activities might conflict with Dr. Lieponis' diagnosis, Travelers arranged a Functional Capacity Evaluation ("FCE") for Piscottano in October 1995 to verify the extent of her disability. The FCE concluded that "[i]t is likely that the client can complete an 8–hour work day at a light level." 10/95 FCE Report, Def.'s Ex. 12. The FCE recommended that Piscottano gradually transition to full-time work.

In late September 1995, MetLife scheduled Ms. Piscottano for an Independent Medical Evaluation (IME) to be conducted by Dr. Buza. Dr. Buza's report concluded that Piscottano was "capable of sedentary and probable light category of work with restrictions for lifting and bending." 10/95 IME Report, Def.'s Ex. 14. Dr. Buza's evaluation summary ended with the suggestion that Piscottano should enter a multi-disciplinary program of physical, occupational, and psychological therapy to "maximize functional status." *Id.*

On December 6, 1995, Dr. Lieponis wrote to Travelers, agreeing with both the FCE and Dr. Buza that Piscottano has some work capacity and that she needed to transition gradually back to employment. Dr. Lieponis also noted that after the FCE, Piscottano had "an acute flare-up of symptoms which resulted in incapacitating pain with complete cessation of even daily activities for a period of weeks." 12/6/95 Lieponis Letter, Def.'s Ex. 16. Lieponis stated that Piscottano's work capacity on an extended basis "is far less" than that determined by the FCE. However, he concluded that a sedentary job that allowed her to change positions frequently and that did not involve lifting, bending, pulling or pushing "would appear to be within her capabilities." *Id.*

Travelers responded to Dr. Lieponis on February 8, 1996, noting that because the recent medical information indicated that Piscottano had a full-time capacity for sedentary work, she "no longer meets our definition of disability." Travelers acknowledged that Piscottano suffered "discomfort" following the FCE, but added that "the testing did ask her to perform certain physical tasks which would not be required in a sedentary job." 2/8/96 MetLife Letter, Def.'s Ex. 18. Travelers gave Dr. Lieponis fifteen days to provide documentation "in the form of clinical medical evidence" if he disagreed with the content of the letter. *See id.*

On March 7, 1996, Dr. Lieponis submitted a case report stating that Piscottano's condition had "plateaued" and that she has symptoms that "preclude her from returning to a normal lifestyle." He concluded that "based on her clinical evaluation as well as historical data, ... she is not at this point able to perform a job description on a full time basis" and while she "does have some work potential," that potential depends on her pain management. He recommended that she enroll in a chronic pain management program. *See* 3/7/96 Lieponis Letter, Def.'s Ex. 20.

MetLife then sent Plaintiff's entire file to Network Medical Review ("NMR") for an independent medical review by Dr. Robert Petrie. *See* Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 7. On April 25, 1996, Dr. Petrie concluded, based on a review of Piscottano's entire file, that she was capable of performing full-time sedentary work. *See* 4/25/96 Petrie Letter, Def.'s Ex. 21. He also observed that Ms. Piscottano

> has an active life raising five children, three of her own, as well as two foster children. Although she reports the children to be in day care, there are none-the-less [sic] necessary activities involved with parenting young children.

she indicated that "she hates being on disability and would love to be able to return to work at some job that did not require her to sit all day or stand, etc." The Travelers agent then asked if "she was the same lady who is

running for mayor. She said yes ... [and that while mayor was a full-time job,] it would allow her to move around at will and not lock her into sitting or standing for prolonged periods." Def.'s Ex. 8.

It is also noted in statements from the claimant herself that she is involved with various church and political activities and is on the parish council and the board of aldermen. Such meetings undoubtedly require sitting and, in my opinion, are not significantly different from typical sedentary occupations such as secretarial work.

Dr. Petrie spoke to Dr. Lieponis on July 8, 1996, at the request of MetLife. Petrie detailed the conversation with Lieponis in a July 8, 1996 letter to MetLife, which reported that Dr. Lieponis had attributed Plaintiff's inability to return to work to a chronic pain condition rather than any neuromuscular impairment, and had indicated that if Ms. Piscottano worked a sedentary job, she would "probably end up missing one week per month due to increased pain complaints." 7/8/96 Petrie Letter, Def.'s Ex. 23. During that conversation, Dr. Lieponis also told Dr. Petrie that Piscottano would have other psychosocial barriers preventing her from returning to work given the amount of time she had spent unemployed.

Dr. Petrie's July 8, 1996 letter informed MetLife that this conversation with Dr. Lieponis did not change his previous opinion that Ms. Piscottano could indeed return to work. In support of his opinion, Dr. Petrie stated that Plaintiff's pain complaints are not linked to specific activities, are not linked to certain anatomic locations, and are not continuous. He noted again that Piscottano is raising five children and that most states require foster parents to be in good mental and physical health. He also concluded that "due to the fact that the claimant apparently had no significant problems with her back during a 6–month interval during her pregnancy in 1991 and 1992, there would seem to be obvious psycho-social factors which are interfering with this claimant's ability to return to work." 7/8/96 Petrie Letter, Defendant.'s Ex. 23.

MetLife's records indicate that in October 1996, MetLife and Ms. Piscottano discussed the possibility of her returning to work on a part-time basis, or entering a training program. See Def. Ex. 25, 26. In these conversations, Piscottano indicated that Dr. Lieponis opposed her return to work. See id.

In 1997, Piscottano began a second campaign for Mayor of New Haven. See Def.'s Ex. 27. On May 15, 1997, after MetLife learned this information, MetLife wrote to Plaintiff's lawyer, Nicholas Nesi, stating that MetLife needed to know Dr. Lieponis' opinion about plaintiff running for Mayor given her certification as totally disabled. MetLife also asked whether Piscottano had ever attended the pain program Lieponis had recommended, and, if so, the results of such treatment. MetLife concluded by warning that if it did not receive complete medical documentation by May 19, 1997, SNET had the right to demand an independent medical evaluation ("IME"). See 5/15/97 MetLife Letter, Defendant.'s Ex. 28.

When the requested documentation was not forthcoming, MetLife scheduled an IME to take place in New Britain. See Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 9. Attorney Nesi contacted MetLife and requested relocating the exam since Ms. Piscottano "cannot sit for more than fifteen minutes at a time." 6/9/97 UDS Entry, Defendant.'s Ex. 29. In response, MetLife rescheduled an IME with Dr. Connair in North Haven. See Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 9. On June 25, 1997, Dr. Connair examined Ms. Piscottano. See 6/25/97 UDS Entry, Defendant.'s Ex. 31.

Dr. Connair's examination concluded that Piscottano had limited work capabilities due to a combination of the pain in her back and her psychological condition. He stated:

Her pain in the lower back and to a lesser extent in the left lower extremity severely limit her work, recreational, and household activity capacity.... She is capable of many specific physical ac-

tivities, as demonstrated by the Ergo–Science Physical Work Performance Evaluation Summary of 10/12/95. She is capable of many individual activities, however, may only perform them intermittently because of the pain with prolonged sitting or standing. She must lie down 3–4 hours a day, which makes it difficult to work outside the house more than a few hours at a time. She may or may not tolerate prolonged periods outside of the house sitting and standing, and then having to come home and take care of her five children. There is a psychological barrier to returning to work as well; after someone has been out of work for as long as she, it is difficult getting them back to gainful employment for psychological reasons in addition to limitations imposed by pain. Selected work duties would not be dangerous for her to attempt to return to, say 2–4 hours a day initially. It would be very difficult for her to find a job, however, considering her long period of disability and the fact that she may be an unreliable worker (if she has to take time off because of a particularly severe period of lumbar pain).

6/97 IME Report, Defendant.'s Ex. 32, Plaintiff.'s Ex. H.

On September 9, 1997, MetLife wrote to SNET following Dr. Connair's examination of Ms. Piscottano. The letter stated that "[i]t has been determined that Ms. Piscottano only has a part-time work capacity and would be unable to return to any type of gainful employment ... [t]herefore, Long Term Disability Benefits will continue.... We will be requesting medical updates periodically." 9/9/97 MetLife Letter, Plaintiff.'s Ex. A.

The determination that Ms. Piscottano was eligible for LTD benefits, however, was short-lived. A MetLife record dated September 19, 1997 notes MetLife's concern that while Piscottano's doctor indicates that she is "severely disabled," she "appears to have a much greater level of functionality based on news articles, etc.

outlining her campaigning activities." Defendant.'s Ex. 33. In response to the inconsistencies MetLife perceived between Dr. Connair's August 1997 report, on the one hand, and Piscottano's reported mayoral campaign activities and the 1995 FCE, on the other, MetLife scheduled an FCE for October 14 and 15, 1997. *See* Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 9–10.

MetLife then wrote to Plaintiff's attorney, informing him of the scheduled exam and stating that the hospital must be given 24 hours notice for cancellation. *See* Plaintiff.'s Ex. E. On October 6, 1997, Attorney Nesi wrote to MetLife requesting without explanation that MetLife postpone Plaintiff's FCE until after November 7, 1997. *See* 10/6/97 Nesi Letter, Plaintiff.'s Ex. F, Defendant.'s Ex. 51. On October 9, 1997, MetLife responded to Attorney Nesi, asking for the reason, in writing, that Ms. Piscottano wanted to reschedule her exam. *See* 10/9/97 MetLife Letter, Defendant.'s Ex. 52. Attorney Nesi apparently did not respond to MetLife, and Piscottano did not attend the FCE on October 14 and 15. *See* Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 10. On October 20, 1997, MetLife wrote to Nesi again, this time asking if Ms. Piscottano's campaign was the reason she wanted to reschedule the FCE, and informing Nesi that MetLife had scheduled another FCE for October 28 and 29. *See* 10/20/97 MetLife Letter, Plaintiff.'s Ex. G, Defendant.'s Ex. 54. Nesi did not reply to MetLife's letter or phone calls, and Ms. Piscottano failed to either attend the FCE scheduled on October 28 and 29 or notify the hospital or MetLife to cancel the FCE. *See* Defendant.'s Ex. 55.

On October 14 and 15, 1997, while Ms. Piscottano was scheduled to attend the FCE, InPhoto Surveillance did surveillance of her activities, at the request of MetLife. The surveillance report from October 14 observed Ms. Piscottano as she exited her house, shut the door with her right hand, followed children to the school

bus, walked back to the house, bent at a 90 degree angle to pick up trash with her right hand, walked to the house and opened the door with her right hand. Later in the morning, she was observed driving a van. Still later, she carried bags in both hands and opened the door with her left hand. *See* 10/24/97 Investigative Report, Defendant.'s Ex. 34. Defendant notes that Plaintiff did all of these things "without evidence of pain or discomfort." *See* Defendant.'s Mem. in Supp. of Mot. for Summ.J. at 10. Surveillance from October 15 reported that, in the course of a televised mayoral debate, Ms. Piscottano stood, sat straight in a chair, crossed and uncrossed her legs, and conversed with other candidates. When the debate ended, after about sixty minutes, she got up from her chair and spoke to people in the room in a "normal unrestricted fashion."

In total, MetLife obtained a video recording of eighty-two minutes of Ms. Piscottano engaging in various physical activities. *See* 10/24/97 Investigative Report, Defendant.'s Ex. 34. Additional surveillance from October 28, 1997, capturing four minutes of Ms. Piscottano's activities, reported that Plaintiff was seen walking briskly wearing high heels, bending at the waist to pick up car keys, and carrying a storage box of papers to her car—all without signs of pain or discomfort. *See* 11/6/97 Investigative Report, Defendant's Ex. 35.

On October 17, 1997, MetLife sent letters to both Dr. Lieponis, Piscottano's treating physician, and Dr. Connair, the IMF, stating that it was currently evaluating Piscottano's LTD benefit eligibility, and asking whether, based on their examinations of Ms. Piscottano and the job description of mayor, Piscottano would be capable of running an active campaign on a full-time basis and performing the duties of mayor. *See* 10/17/97 MetLife Letters, Defendant.'s Ex. 36–37.

Dr. Lieponis responded to MetLife on October 20, 1997 by stating that Piscottano's impairment is based on pain and he has no data to substantiate the allegation that her condition has changed. According to Lieponis, Piscottano had been determined to be totally disabled based on "medically accepted criteria" and he has "no opinion regarding her ability to seek public office." 10/20/97 Lieponis Letter, Defendant.'s Ex. 40.

MetLife wrote back to Dr. Lieponis on November 13, 1997, enclosing the surveillance video of Ms. Piscottano. MetLife asked Dr. Lieponis whether the recorded activities were consistent with Piscottano's "alleged disabling condition" and whether she could work an 8–hour day. MetLife also requested clarification of the "medically accepted criteria" to which Lieponis referred in his last letter, and asked Dr. Lieponis to specify the objective medical tests on which he based his conclusion that Ms. Piscottano is totally disabled. *See* 11/13/97 MetLife Letter, Defendant.'s Ex. 38.

Lieponis subsequently informed MetLife that his fee to watch the surveillance video and answer the questions is $500 per hour. Lieponis did not address MetLife's inquiry about the basis for his conclusion that Piscottano was totally disabled and the medically accepted criteria on which he had relied. *See* 11/17/97 Lieponis Letter, Defendant.'s Ex. 41. MetLife considered the fee exorbitant and did not follow up with Dr. Lieponis. Dr. Connair never responded to MetLife's October 17, 1997 inquiry.[3]

C. *Termination of Piscottano's LTD benefits*

On December 11, 1997, MetLife wrote to Plaintiff's attorney, advising him that Plaintiff's disability benefits would be terminated as of December 31, 1997. In that letter, Defendant asserted two primary reasons for the termination of Ms. Piscot-

---

**3.** Because the clarifying supplemental information was never provided by Dr. Connair,

MetLife apparently decided that the IME was incomplete.

tano's benefits: 1) she did not supply sufficient evidence of her disability, and 2) her activities were inconsistent with her disability.

First, MetLife explained that it had not been provided with "the medical documentation requested in order to justify continued payment of your client's claim" and that Ms. Piscottano "has failed to supply medical proof of continuing disability as required by Metropolitan Life." 12/11/97 MetLife Letter, Defendant.'s Ex. 42.

Next, the letter focused on Ms. Piscottano's 1997 campaign for Mayor, noting that she "has presented herself as a qualified candidate" and that she had been an Alderwoman for the City of New Haven. In addition, the letter observed,

> [t]his has provided your client [with] political experience. She has demonstrated the ability to travel. She has demonstrated leadership and planning skills all needed in order to run a campaign. During her daily activities there were no visible limitations or restrictions. Your client's activities are inconsistent with the medical findings of her attending physician. Your client has demonstrated she is able to engage in any occupation, such as the position of Mayor of New Haven.

*See* Defendant.'s Ex. 42. MetLife also drew upon statements that Piscottano had made during the televised campaign debate such as, "I was a past Alderwoman for the 18th ward of the Morris Cove section, I care about New Haven. It is in need of revitalization . . ." and that she promised to go "block by block to bring the city back," as evidence of both her willingness to work and her physical capabilities. *See id.* Based on this information and the lack of medical information to the contrary, MetLife concluded that Ms. Piscottano "no longer meets the definition of total disability." *Id.* at 1.

Ms. Piscottano was also advised of her right to appeal MetLife's determination. During the appeal, as part of the review process, MetLife requested that Plaintiff's new attending physician, Dr. Sumner answer questions about a back surgery that Ms. Piscottano had recently scheduled, its purpose, why it was not performed before the November 1997 election and if she had obtained a second opinion as to its necessity. MetLife also asked whether Dr. Sumner had consulted with Plaintiff's prior treating physicians, how her claim of total disability was consistent with her mayoral campaign activities, and whether her condition had changed from June 1997 to date. *See* 2/18/98 MetLife Letter, Defendant.'s Ex. 44.

Dr. Sumner responded on February 27, 1998, stating, without reference to any medical examination or findings, that Ms. Piscottano's "total disability issues are based on back pain which severely limits her activity." 2/27/98 Sumner Letter, Defendant.'s Ex. 46. In response to the question about her mayoral campaign, Dr. Sumner indicated that "according to the patient this can be done from a seated position." He noted that Piscottano's "pain has been fairly stable since the time [sic] and she put off any surgical intervention until she could resolve the mayoral race." In conclusion, he stated, again without explanation or reference to medical findings to support the conclusion, that he did not believe that Ms. Piscottano could sit for an 8–hour day and work in an office as she had done in the past. *See id.*

In March 1998, MetLife asked Drs. Moyer, Porter and Silver at Network Medical Review ("NMR") to review Ms. Piscottano's file, including her medical records from her treating physicians, the IME report, a description of her previous job with SNET, and the surveillance tapes, to determine the extent of her disability. The NMR doctors noted that in the surveillance reports, Ms. Piscottano was observed standing, sitting, twisting, bending and wearing high heels "without any signs of discomfort," and that "it is not conceivable how someone who served as Alderwoman for the City of New Haven, Connecticut

and who campaigned for Mayor of New Haven could be considered disabled and incapable of doing sedentary work. Third party observations would confirm this inconsistency." 3/15/98 NMR Review, Defendant.'s Ex. 45, at 3.

The NMR report concluded that although Piscottano is "impaired" by her chronic back pain, she is "still capable of performing sedentary to light work" and that "[t]here is no reason she could not perform the sedentary to light job duties of a public official." *Id.* The report noted that Piscottano had the ability to sit "eight hours per day, with the ability to change positions as needed." *Id.* The NMR report also questioned the validity of Dr. Connair's findings in his June 25, 1997 IME, observing that

[i]t is somewhat perplexing that Dr. Connair in his report of June 25, 1997 went on to state that Ms. Piscottano is totally disabled because, "She must lie down 3 to 4 hours per day and that she is incapable of working outside the house more than a few hours at a time." It would seem impossible for an elected official to continue functioning with those imposed restrictions. Furthermore . . . [h]e suggested that it would be difficult for her to return to work simply because she has been off work a long time already. . . . In essence he feels she will always be disabled because she always has pain and because she has been off of work so long already. Clearly this is not the case. Not only does the evidence suggest the contrary, but pain complaints alone should not be the basis on which disability is determined.

*Id.* at 4. The report concluded that "[t]here is insufficient information or data provided to support that Ms. Piscottano is unable at present to perform the job of an elected official for the city of New Haven, Connecticut." *Id.* at 5.

On March 30, 1998, MetLife sent a letter to Plaintiff's attorney, closing Ms. Piscottano's appeal and upholding the termination of her benefits. *See* 3/30/98 MetLife Letter, Defendant.'s Ex. 47. The appeal denial letter outlined Ms. Piscottano's medical history, beginning in 1976 and continuing through December 31, 1997 when her benefits were terminated. MetLife noted that in November 1993, Ms. Piscottano ran for and won the position of Alderman on the New Haven City Council, inferring from this "that she was able to control her experience of pain in some manner such that she was able to attend scheduled meetings as well as be available to the citizens of New Haven in the capacity of a public official." 3/30/98 MetLife Letter, Defendant.'s Ex. 47, at 2. The letter noted, "[w]e recognize that this position did not meet the criteria of 'any occupation' in either the area of hours per week or earned income [b]ut it did give evidence that Ms. Piscottano was recuperating nicely and was motivated to return to a work environment." *Id.* at 2.

The letter then described both Plaintiff's "admirable" performance on her 1995 FCE and her subsequent incapacitating pain, and cited Dr. Lieponis' statement in July 1996 that her "failure to return to work was not based on neuromuscular impairment, but rather a chronic pain condition." The letter also observed a

consistent consensus by all medical providers that she had some work capacity from about 1996 onward [but b]ecause this capacity was determined to be part time, at best, the benefits were continued through September, 1997 when attorney Nesi asked that a lump sum settlement be considered on the claim. SNET was not interested in negotiating a settlement and by October, 1997 was made aware that your client was (again) running for Mayor of New Haven.

*Id.* at page 3.

The letter documented the numerous attempts by MetLife to reconcile Plaintiff's observed campaign and personal activities with her alleged disability, which included asking both Dr. Lieponis and Dr. Connair to review the surveillance tapes

and explain any inconsistencies with her condition, as well as scheduling and then rescheduling a Functional Capacity Evaluation which Ms. Piscottano inexplicably failed to attend. These efforts left the claim reviewer with only "the materials and documents already in the file for a claim determination basis." *Id.* at page 3.

The letter observed that Ms. Piscottano is "a remarkably resilient woman who, despite multiple surgeries on her lumbar and cervical spines," has demonstrated her ability and desire to go back to work by her campaign for mayor. *Id.* at page 4.

> Clearly, her candidacy for the position of Mayor of the City of New Haven (twice) as well as her position on the City Council indicates she has not only prepared herself for "any other work for which (she) is or may reasonably become qualified ..." but has aggressively pursued this line of work. And she has done so—presumably with the hope, if not the expectation of winning—knowing that she also has five young children at home to care for at the end of very long and demanding workdays. It is not difficult to extrapolate from the media alone that a mayoral position would have required not only eight hour days in the office, but many late and long meetings, political and social events, and untold unanticipated demands on her physical as well as mental stamina. We cannot conclude that Ms. Piscottano was unaware of the requirements of mayor as she has been involved in city politics for several years—long enough to be convinced she not only wanted but was capable of doing the job.

The letter concluded that,

> [t]he record shows no indication of loss of control or muscle wasting in her arms or legs due to real or assumed nerve damage as a result of her back condition. And the fact remains—regarding her persistent complaint of pain—that healthy individuals experience a variety of transient discomforts such as headaches, back pain, postexertional pain, fatigue, insomnia, stiffness, colds and depression throughout their lifetime. These transient comforts do not render the individual unable to be gainfully employed.

According to MetLife, Ms. Piscottano's "ongoing subjective history of pain has not been supported for a significant period of time up to the date of withdrawal by quantifiable medical data. And, as previously noted, her daily activity belies the severity if not the fact of the alleged pain." *Id.* at page 4.

## III. Discussion

### A. *Standard of review*

On a motion for summary judgment under Fed.R.Civ.P. 56, the moving party has the initial burden of establishing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the record, all ambiguities and reasonable inferences are viewed in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The non-moving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

There is a "genuine issue" of material fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper only when reasonable minds could not differ as to the import of the evidence. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. A "material fact" is "an essential fact of the nonmoving party's case," *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548, or a "fact that might affect the outcome of the suit," *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In a case under ERISA challenging a plan administrator's decision to deny benefits, the scope of judicial review depends on the type of plan at issue. Where "the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," the standard for this Court's review is whether the plan administrator's determination was arbitrary and capricious. *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir. 1995); *accord Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The LTD benefits plan at issue here gives MetLife, the claim administrator, discretion to interpret it and to resolve questions of eligibility for benefits. *See* Defendant.'s Ex. 2, Summary Plan Description, A–14. Neither party disputes that "arbitrary and capricious" is thus the appropriate standard for review.

■ A court may set aside a decision to deny benefits as "arbitrary and capricious" only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan,* 52 F.3d at 442 (*quoting Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993)). "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995) (*quoting Sandoval v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 382 (10th Cir.1992)). In determining whether a plan administrator's decision was arbitrary and capricious, this Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Pagan,* 52 F.3d at 442 (*quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

■ Finally, in reviewing a denial of benefits under ERISA, a district court is bound to consider only the record before the administrator when it made its decision. *See Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995). Therefore, this Court's determination of whether MetLife's decision was arbitrary and capricious is limited to the record before MetLife when it made its determination that Ms. Piscottano was ineligible for LTD benefits.[4]

B. *Application of the arbitrary and capricious standard to MetLife's termination decision*

MetLife's December 11, 1997 termination letter and March 30, 1998 appeal denial letter indicated that its decision to terminate Piscottano's benefits was based on MetLife's conclusion that her campaign activities were "inconsistent with the medical findings of her attending physician" and "Ms. Piscottano no longer meets the definition of disability as defined in the SNET contract," as well as her failure "to supply medical proof of continuing disability as required by Metropolitan Life." Defendant.'s Ex. 42, at 7; *see also* Def.'s Ex. 47. There is no dispute about the facts themselves, although the parties vigorously dispute what conclusion MetLife was reasonably entitled to draw from the facts. The issue before this Court on these cross-motions for summary judgment, therefore, is whether MetLife's decision to terminate Piscottano's LTD benefits for these reasons was arbitrary and capricious. Met-

4. Contrary to Plaintiff's assertion, the record is not limited to the time between the September 9, 1997 determination of eligibility and the December 11, 1997 decision to terminate. MetLife had an ongoing responsibility to review Plaintiff's entire medical history in making its eligibility determinations, and the record for purposes of this Court's review includes not only plaintiff's past medical history, but also the evidence submitted to MetLife during the appeals process that it relied upon in making its decision to uphold its earlier determination of ineligibility. *See Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991).

Life's decision will be upheld by this Court as long as it was based on "substantial evidence," even if the evidence presently in the record could also reasonably support a contrary determination. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (plan administrator's denial of benefits not arbitrary and capricious where the "decision simply came down to a permissible choice between the position of UMAC, MetLife's independent medical consultant, and the position of [the claimant's physicians]").

1. *MetLife's determination that Plaintiff's activities were inconsistent with her disability and that she had recovered from her disability*

SNET's Long Term Disability Plan clearly states that LTD benefits will be terminated if the claimant "perform[s] activities which are inconsistent with [her] diagnosis or disability." Long Term Disability Plan, LTD–7, Defendant.'s Ex. 1. It also provides that benefits will terminate "if the insurance company determines that you are no longer disabled under the terms of the plan." *Id.* at LTD–8. The Plan states that a claimant is considered "totally disabled" if she is "unable to perform the duties of any job for which [she is] qualified—or may reasonably become qualified—by training, education, or experience; or if the only job(s) for which [she] could become qualified would pay less than half [her] base pay at the end of the 52–week Sickness Disability Benefits period." *Id.* at LTD–11. Because MetLife relies on the same activities and medical evidence to justify both conclusions, this Court analyzes them together.

According to the denial letter, MetLife considered Plaintiff's campaign for Mayor in both 1995 and 1997, as well as her position of Alderman in 1993, to involve activities inconsistent with her disability. MetLife also determined that it does "not find sufficient evidence to support a continuing total disability of such severity beyond December 31, 1997 that the option or

choice of returning to any occupation for which she is or may reasonably become qualified has been removed from her." Defendant.'s Ex. 47. In reaching this conclusion, MetLife relied on Ms. Piscottano's medical records, the surveillance reports, newspaper articles, common knowledge of the demands of serving as an Alderman and Mayor and Ms. Piscottano's public statements of intent to voters during her mayoral campaign.

In response, Plaintiff claims that her observed campaign and personal activities were not inconsistent with the physical limitations of her disability as Defendant never saw her engaged in a any particular activity for a prolonged period of time. *See* Plaintiff's Mot. for Summ.J. at 5–6. In addition, Plaintiff argues the absence of any medical information between September 9, 1997, when MetLife wrote to SNET recommending continuing Piscottano's benefits, and December 11, 1997, when MetLife terminated her benefits necessarily makes the termination decision arbitrary and capricious. Finally Plaintiff claims that MetLife failed to provide evidence that Piscottano would make at least fifty percent of her previous salary in the sedentary to light work MetLife concluded she was capable of doing renders its decision. *See* Plaintiff's Reply, at 5.

MetLife's surveillance recorded the Plaintiff walking, sitting in one chair for over an hour during a campaign debate, bending, driving, closing and opening doors, and carrying bags—all without apparent discomfort. *See* Defendant's Exs. 34–35.

Further evidence of Ms. Piscottano's activities came from Dr. Petrie's April 25, 1996 report, which noted that Ms. Piscottano "has an active life raising five children, three of her own, as well as two foster children. Although she reports the children to be in day care, there are none-the-less [sic] necessary activities involved with

parenting young children."[5] Dr. Petrie's conclusion does not reflect the specifics of Ms. Piscottano's child-care arrangements and responsibilities, although Plaintiff does not offer contrary evidence that she is incapable of performing basic physical activities associated with young child care. Dr. Petrie also noted that Plaintiff is involved with various church and political activities and serves on the parish council and the board of aldermen, concluding that Plaintiff's political and church meetings "undoubtedly require sitting and, in my opinion, are not significantly different from typical sedentary occupations such as secretarial work." These inferences of Plaintiff's sedentary activity capacity by reference to her volunteer activities are neither unreasonable nor sheer conjecture.

■ Because Dr. Petrie never examined Ms. Piscottano, his opinions about her medical condition are entitled to less weight than those of Piscottano's treating physicians who were in a better position to evaluate the extent and severity of her pain. *See Durr v. Metropolitan Life Ins. Co.*, 15 F.Supp.2d 205, 213 (D.Conn.1998) (factors to be used to determine how much weight to give a treating physician's opinion on the nature and severity of an individual's impairments include " '(i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors' ") (quoting Social Security standards from 20 C.F.R. § 404.1527(d)(2)–(6)). The court in *Durr* noted that although the Social Security standards are not binding in ERISA cases, "they are nonetheless instructive." *Id.* at 213 n. 2 (*citing Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 n. 11 (7th Cir.1992); *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 &

n. 6 (10th Cir.1988); *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420–21 & n. 6 (11th Cir.1984)). For this reason, as well as the fact that Petrie's report is largely conclusory in nature, this Court does not believe that the report alone could provide "substantial evidence" for MetLife's determination of ineligibility. However, the objective medical evidence in the record and the evidence of Ms. Piscottano's observed campaign activities together provide a valid basis for MetLife's decision.

The medical evidence establishes that all the doctors who examined Ms. Piscottano from 1995 through 1998 concluded she has some work capacity, though the extent of that capacity is disputed. The 1995 Functional Capacity Exam report indicates that, based on a four and a half hour examination with no rest periods, she is capable of "light" work, but is "limited primarily by pain in her lower back, lower extremities, neck and shoulder." 10/95 FCE Report, Defendant.'s Ex. 12. The FCE also concluded that she had tolerance for sedentary work, based on her ability to tolerate various positions, such as sitting and standing. *See id.* The FCE's final conclusion was that "[i]t is likely that the client can complete an 8–hour work day at a light level," and recommended that she "return to work modified duty for 4 hrs per day, 5 days per week with a gradual transition to work full duty for 8 hrs per day, 5 days per week over the following 2–4 weeks." *Id.;* Def.Ex. 13.

On September 22, 1995, Dr. Buza's IME, though explicitly noting that Plaintiff's pain increases with activity and that FCEs do not evaluate pain with function for longer periods of time, stated that "[b]y my evaluation today, it would appear that the patient is capable of sedentary and probable light category of work with restriction for lifting and bending." 10/95 IME Report, Defendant.'s Ex. 14. Buza also noted

---

5. The gender-based assumptions Petrie makes about the child care duties a mother must "necessarily" engage in are questionable, particularly given Piscottano's statements to various doctors in the medical records that her husband performs much of the household work.

that the limitations on Piscottano's ability to return to work "include the factor that the patient has been officially out of work for seven years and that her pain increases with activity which I am unable to evaluate with my evaluation." *Id.*

Dr. Lieponis, Ms. Piscottano's treating physician, has repeatedly determined that Ms. Piscottano is capable of some work. On December 16, 1995, he wrote to Travelers stating that he agreed with the conclusions Buza had reached in his IME, and stated that "it is my opinion that Ms. Piscottano does indeed have some work capacity." 12/6/94 Lieponis Letter, Defendant's Ex. 16. He concluded that although he believed the FCE had overstated Ms. Piscottano's abilities, "a sedentary job which allows her to change positions frequently would appear to be within her capabilities." *Id.*

In response to Travelers' February 8, 1996 letter indicating that based on the medical information, Piscottano no longer met the definition of disability, however, Lieponis stated that Piscottano has "a chronic pain syndrome which I do not anticipate will change." 3/7/96 Lieponis Letter, Defendant's Ex. 20. He stated cryptically that it was his "opinion that she is not at this point able to perform a job description on a full-time basis" and went on to add that "[a]ny job description that involves prolonged sitting, standing, bending, pulling or pushing is likely to result in incapacitating pain and is well beyond her physical capabilities. This is based on her clinical evaluation as well as historical data. She does have some work potential. This is totally dependent on management of her pain syndrome." *Id.* In a conversation with Dr. Petrie in July 1996, Lieponis reportedly stated that he felt she was capable of performing sedentary job activities, but that based on his past experience with Piscottano's activities, she would probably end up missing one week per month due to increased pain complaints. *See* 7/8/96 Petrie Letter, Defendant's Ex. 23.

In his October 20, 1997 letter to MetLife responding to their request for medical information about whether Piscottano's campaign activities are consistent with her disability, Lieponis tersely stated that "Ms. Piscottano was determined to be totally disabled based on medically acceptable criteria. I have no data to substantiate the fact that Ms. Piscottano's condition has changed." 10/20/97 Lieponis Letter, Defendant.'s Ex. 40. From this Court's review of Lieponis's previous letters, however, it appears that his prior letters all express the opinion that she has some level of capacity for sedentary work, and that she could even be capable of full-time work, if she were allowed to change positions frequently.

Dr. Connair's independent medical evaluation of Ms. Piscottano on June 25, 1997, commissioned by MetLife, found that she "is capable of many specific physical activities" but "may only perform them intermittently because of the pain with prolonged sitting or standing." 6/97 IME Report, Defendant.'s Ex. 32, Plaintiff.'s Ex. H. Connair unhelpfully observed that "she may or may not tolerate prolonged periods out of the house sitting and standing, and then having to come home and take care of her five children." *Id.*

Finally, Dr. Sumner, Piscottano's treating physician in 1998 during her appeal, indicated that "Ms. Piscottano has a well-documented non-union" and that she had postponed surgery for the non-union until after the mayoral race, noting that her pain had been "fairly stable." 2/27/98 Sumner Letter, Defendant.'s Ex. 46. He stated that "her total disability issues are based on back pain which severely limits her activities. I do not know the physical demands of running for mayor but according to the plaintiff this can be done from a seated position.... However, I do not think she can sit for a full eight hour day and work in an office as she was doing in the past." *Id.*

Read together, Plaintiff's 1995 FCE, Dr. Buza's IME and Dr. Connair's June 1997 IME, all essentially stating that Ms. Piscottano could work but would need to have a flexible schedule, support the conclusion that MetLife's termination decision was neither arbitrary nor capricious. *See Terry v. Bayer Corp.*, 145 F.3d 28, 41 (1st Cir.1998) (termination not arbitrary and capricious where plaintiff's record contained reports of several doctors, including the plaintiff's treating physician, who "had at various times determined that Terry could perform either part-time or full-time sedentary work").

Ms. Piscottano's observed campaign and personal activities do not appear to be inconsistent with any of these medical opinions or tests. As discussed, all the medical information stated that she had some work capacity to perform various physical activities, and MetLife's surveillance simply confirmed that capacity. Moreover, her statement to Dr. Sumner in 1998 that she was capable of running for mayor because it could be done "from a seated position" belies her claims that she is unable to engage in sedentary work.

However, while her activities were consistent with the medical statements of her capabilities, MetLife reasonably concluded that they were *inconsistent* with her claim of total disability. Dr. Lieponis had stated that her disability was based on incapacitating pain. Her activities, combined with the absence of any medical evidence that her pain was as severe as she and her treating physician claimed and consistent medical evidence in the record that she was capable of returning to work, provide substantial evidence for MetLife's decision that she was no longer disabled based on pain.

As discussed below, Plaintiff points to no medical information from Lieponis or any other physician explaining the apparent inconsistency between her campaign activities and her allegations of incapacitating pain. Plaintiff argues that such evidence is unnecessary because of the September 1997 letter concluding that she was eligible for benefits, and that in the absence of medical information indicating that her condition has changed, MetLife's reliance on her campaign is impermissible.

This Court believes that, based on the evidence before MetLife at the time, the September 1997 reasonably concluded that Piscottano was capable of only part-time work. However, that does not end the inquiry. After MetLife discovered that Piscottano was actively running a second mayoral campaign, its pursuit of medical clarification as to whether or not Ms. Piscottano's campaign activities were in conflict with her claimed disability was not unreasonable.[6] To MetLife, it appeared that in one breath, Piscottano claimed to be so incapacitated by pain that she was unable to work in any occupation for which she was qualified, but yet in another, she was running an active campaign for mayor of the City of New Haven.

Ms. Piscottano's campaign activities provide a valid basis for MetLife's assessment of whether Ms. Piscottano's activities were inconsistent with her disability. Evidence of physical activity that appears inconsistent with a finding of total disability by a treating physician, such as the surveillance tapes involved here, while not dispositive, is nonetheless relevant for the administrator to consider.[7] *See Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of America*, 222 F.3d 123 (3rd

---

**6.** Although it appears that MetLife was aware of her campaign in May 1997, and therefore had this information when it made the September 1997 determination, MetLife did not have the evidence from the surveillance or the mayoral debate, which indicated that Piscottano was actively campaigning, until October 1997. Contrary to Plaintiff's suggestion, this is not a case in which this Court is being asked to find that a reversal of eligibility based on a record that had not changed at all between the two decisions is not arbitrary and capricious.

**7.** Plaintiff argues that, given the political reality of New Haven—the entrenchment of Democrats in City Hall and the fact that she ran as a Republican in 1995 and then as an Independent in 1997—she had no chance of winning the mayoral seat and never really intended to

Cir.2000) (termination of plaintiff's disability benefits based in part on his lifestyle, including his ability to do housework, walk his dog and drive, was reasonable despite the contradictory opinion of plaintiff's treating physician); *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, (5th Cir.1994) (denial of benefits relying in part on results of private investigator's surveillance of plaintiff and interviews with plaintiff's neighbors not arbitrary and capricious).

Moreover, part of the blame for Defendant's failure to get the requested medical clarification falls on Ms. Piscottano, who was apparently too busy with her campaign to attend either of the two functional capacity evaluations scheduled in October or to explain the reason for her absence to MetLife, speaking to a level of activity consistent with being no longer "disabled."[8] The $500 hourly fee Lieponis indicated he would charge to review the surveillance tapes was not unreasonably determined by MetLife to be too expensive, and neither Lieponis nor Connair ever made any effort to medically reconcile Plaintiff's status of having to "lie down 3–4 hours a day," Connair Letter, Pl.Ex. H, and suffering from "incapacitating pain" from "prolonged sitting, standing, bending, pulling or pushing," Lieponis Letter, Def. Ex. 20, with her actual, observed physical activities.

■ Where, as here, the LTD plan requires the claimant to submit evidence of continuing disability, the burden of establishing disability lies on the claimant, and the plan administrator is not required to prove that the claimant is not disabled. *See Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 46 (3d Cir.1993); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir.1991). Because the burden was on Ms. Piscottano to provide medical evidence of her disability, the absence of relevant medical information, given Met-Life's efforts to obtain it from both Dr. Lieponis and Dr. Connair before the claim was denied in December 1997, and the failure of Dr. Sumner's March 1998 report to provide medical information to address the apparent contradiction between Plaintiff's actions and her disability, thus supports MetLife's position that its determination was reasonable, rather than Ms. Piscottano's argument that the denial was unreasonable.

In *Terry v. Bayer Corp.*, 145 F.3d 28, 41 (1st Cir.1998), the court found the decision to terminate the plaintiff's benefits was reasonable despite the contradictory medical opinions before the committee making the determination. There, the plaintiff's treating physician had insisted that the plaintiff was completely disabled while the independent medical examiner found that the plaintiff's pain was "out of proportion to all physical findings;" the plaintiff did not follow through with rehabilitation programs; and the original termination letter cited a lack of "objective evidence" to support plaintiff's total disability despite his doctor's submission of a "detailed historical account of [his] problems with knee pain." *Id.* at 31–32.

In support of its conclusion, the court cited such evidence as the reports of "sev-

---

return to work. *See id.* at 6. However, as noted previously, in 1995, when asked whether she was running for Mayor, Ms. Piscottano told Travelers that while Mayor of New Haven was a full-time job, "it would allow her to move around at will and not lock her into sitting or standing for prolonged periods." Defendant's Ex. 8. This Court relies on the apparent inconsistency between her mayoral campaign activities as well as the medical evidence and the claim of total disability in reaching the conclusion that MetLife acted reasonably in denying benefits. Therefore the Court need not decide whether Ms. Piscotta-

no's "inevitable" loss in the mayoral election made MetLife's consideration of her apparent willingness to return to work unreasonable.

8. Plaintiff argues that because her attorney never informed her about the second FCE, she should not be penalized for failing to attend. However, it is undisputed that Met-Life informed Plaintiff's attorney. Under these circumstances, Piscottano cannot claim a lack of knowledge about the FCE. *See Allen v. Nissley*, 184 Conn. 539, 440 A.2d 231 (1981).

eral doctors," including plaintiff's treating physician, who "had at various times determined that Terry could perform either part-time or full-time sedentary work;" the fact that the plaintiff "possessed transferable skills in the computer field;" and, that, "based on observations at the rehabilitation center, Terry was capable of working full-time so long as his job did not entail certain physical tasks, and he was permitted accommodations to alleviate his knee pain." *Id.* at 41.

This Court finds that Ms. Piscottano's observed activities were reasonably construed by MetLife as indicative of an ability to "manage her pain," particularly given the failure of Ms. Piscottano's treating physician to provide any medical explanation of the apparent inconsistency between her observed activities and her claims of disability. Plaintiff offers no evidence that her observed campaign activities were such that she became "incapacitated" by pain. Given the absence of medical information to the contrary before MetLife during the claim review, this Court cannot say that MetLife's conclusion that Piscottano's ability to perform the observed activities and run her campaign indicated that she would be able to perform the activities necessary to sustain sedentary employment was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan,* 52 F.3d at 442 (internal quotations omitted).[9]

2. *MetLife's conclusion that Plaintiff had failed to provide acceptable medical evidence to substantiate her claim of total disability*

The LTD Plan provides that benefits will be terminated if the claimant does "not supply acceptable medical information to the insurance company to justify your disability, or you fail to see another physician if requested by the insurance company." *Id.*

■ It is undisputed that Piscottano failed to respond to MetLife's request for additional medical information reconciling her campaign activities with her physician's conclusion that she was totally disabled and unable to work full-time. As noted above, the dispute is whether the burden to produce such information lies on MetLife, because of its September 9, 1997 determination of eligibility, or on Piscottano, as the claimant. For the reasons cited previously, given the new information MetLife received about Piscottano's campaign activities, Ms. Piscottano was reasonably required by MetLife to come forward with information supporting her claim of total disability, and her inexplicable failure to do so was a reasonable grounds for termination.

This is not a case in which a candidate for political office is being held to the vague promises of qualification and capability that she made to the voting public during her campaign. Here, Ms. Piscottano was engaged in a campaign for mayor while simultaneously claiming that she was totally disabled and unable to perform the duties of any job for which she was qualified or could reasonably become qualified based on her training, education or experience. Viewing this record as a whole, including the differing but not inconsistent medical reports, Piscottano's failure to provide MetLife with any medical informa-

---

**9.** This Court also rejects Plaintiff's argument that MetLife was required to demonstrate that she would earn at least fifty percent of her previous salary. First, the fifty-percent requirement only applies if MetLife determines that she was able to return to work for which she required retraining. Here, MetLife concluded that Piscottano had recovered because she was no longer unable to return to any occupation for which she was qualified.

Moreover, MetLife's termination decision rested on her inconsistent activities and her failure to submit medical documentation of her disability. Therefore, even if the failure to consider her salary made MetLife's findings that she had "recovered" under the definition of the policy arbitrary and capricious, because the other two grounds for termination were reasonable, this Court would not disturb MetLife's decision.

tion to address its concerns—other than conclusory statements alleging that she was totally disabled but providing no objective evidence to substantiate the claim—and the activities she engaged in while campaigning, this Court finds that MetLife had substantial evidence for its decision to terminate Piscottano's LTD benefits.

## IV. Conclusion

Plaintiff's motion for summary judgment [Doc. # 31] is DENIED. Defendant's cross-motion for summary judgment [Doc. # 27] is GRANTED.

IT IS SO ORDERED.